## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Charles E. Flockhart, Special Agent (SA) of the Drug Enforcement
Administration (DEA), being duly sworn, depose and state that:

## TRAINING AND EXPERIENCE

1.      I am employed as a SA with the United States DEA, and have been so
employed since February 2009.  I am currently assigned to the Anchorage, Alaska
District Office. I have been assigned to the Anchorage District Office (ADO) since
December 2016.  Prior to this, I served as a DEA Special Agent in El Paso, Texas.  I am a
criminal investigator for the United States within the meaning of Title 21, United States
Code, § 878, and therefore I am empowered to conduct investigations of, and make
arrests for, the offenses enumerated in Title 21 and Title 18.  My official DEA duties
include investigating criminal violations of the federal drug laws. In performance of these
duties, I have become familiar with the methods and practices commonly used by drug
traffickers to introduce drugs into the state of Alaska, and likewise, I am familiar with
methods used by traffickers to transmit drug proceeds from Alaska to sources of supply
located outside Alaska.

2.      I have received specialized training in the enforcement of federal drug laws
as found in Title 21, United States Code. Some of the specialized training I have received
includes, but is not limited to, classroom instruction concerning drug smuggling, money
laundering investigations, conspiracy, and complex investigations. I have been involved
in various types of electronic surveillance; the debriefing of defendants, witnesses and

1

informants, as well as others who have knowledge of the distribution and transportation of controlled substances; the laundering and concealing of proceeds from drug trafficking, and the organization, structure and methods of the drug trafficking organizations and street gangs who participate in these illegal activities.

3. In my law enforcement career, I have conducted and/or participated in investigations relating to the use, possession, manufacture, importation, and trafficking of controlled substances, which have resulted in the seizure of controlled substances, including cocaine, marijuana, heroin, methamphetamine, and spice. I have become familiar with, and have participated in, all of the normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, controlled deliveries, the execution of search warrants and arrest warrants, the management and use of informants, issuance of administrative and federal grand jury subpoenas, analysis of toll and financial records, and the use of pen registers. As a result of these investigative experiences, I have become familiar with devices, paraphernalia, techniques, and practices used by people involved in the utilization, possession, manufacture, and trafficking of controlled substances. I have conducted and/or participated in investigations which have resulted in the seizure of cellular devices, firearms, memory cards, computers, surveillance equipment, documents, automobiles, and money. Additionally, I have interviewed people involved in the utilization, possession, manufacture, importation, and trafficking of controlled substances adding to my comprehensive knowledge of the illegal controlled substance environment in Alaska. In addition to my formal training and experience, I have gained insight and knowledge

2

working and communicating with many experienced law enforcement agents from local, state, and federal agencies; I consider this knowledge and insight to be a fundamental part of my experience and training.

4.     As a SA assigned to the Tactical Diversion Squad, I conduct regulatory, civil, and criminal investigations of DEA registrants related to their controlled substances activities. I have also participated in the preparation and execution of administrative inspection warrants. I am knowledgeable of the laws, regulations and procedures pertinent to investigations of the diversion of controlled substances to the illicit market as well as the techniques employed by registrants to divert controlled substances. I am also familiar with federal and state laws which prohibit the distribution of a controlled substance for no legitimate medical purpose and outside the ordinary course of medical practice.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from agents, task force officers, police officers, and witnesses. This affidavit includes only those facts I believe are necessary to establish probable cause and does not include all of the facts uncovered during this investigation.

## PURPOSE OF AFFIDAVIT

6.     This affidavit is made in support of a criminal complaint against Jessica Joyce Spayd ("SPAYD") for violations of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Distribution of a Controlled Substance Resulting in Death).

## SUMMARY OF AFFIDAVIT

7.     SPAYD is a licensed Advanced Nurse Practitioner specializing in pain

3

management and addiction treatment. She operates a medical clinic in Eagle River, AK. Based, among other things, on information provided by SPAYD's "patients" and their families, a review of SPAYD's prescribing history, a three-month undercover investigation, and a medical expert's review of SPAYD's prescribing history and several recordings made during the undercover investigation, there is probable cause to believe that SPAYD is distributing, and has distributed, controlled substances outside of the usual course of professional practice and without a legitimate medical purpose resulting in at least two overdose deaths, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). As a result, highly-addictive controlled substances, including oxycodone, methadone, and fentanyl, have been diverted from legitimate medical use into the community for illegitimate use.

## OVERVIEW OF THE LAW AND POLICY REGARDING PRESCRIPTION MEDICATION

8.      Based on my training and experience, I know that the distribution of controlled substances must meet certain federal rules and regulations. Specifically, I know the following:

a.      21 U.S.C. § 812 establishes schedules for controlled substances which substances present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on that drug. Such controlled substances are listed in Schedule I through Schedule V depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. Controlled Substance Pharmaceuticals are listed as controlled substances, from Schedule II through V because they are considered dangerous. There are other

4

drugs that are available only by prescription but are not classified as controlled substances. Title 21 of the Code of Federal Regulations, Part 1308 provides further listings of scheduled drugs.

b.     Pursuant to 21 U.S.C. § 822, controlled substances may only be prescribed, dispensed or distributed by those persons who are registered with the Attorney General of the United States to do so (with some exceptions, such as delivery persons). The authority to register persons has been delegated to the DEA by the Attorney General.

c.     21 C.F.R. § 1306.04 sets forth the requirements for a valid prescription. It provides that for a "prescription for a controlled substance to be effective [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." [emphasis added]

d.     21 C.F.R. § 1306.05 sets forth the manner of issuance of prescriptions. It states that "All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the name, address, and registration number of the practitioner…." [emphasis added]

e.     21 C.F.R. § 1306.12 governs the issuance of multiple prescriptions and states: "An individual practitioner may issue multiple prescriptions authorizing the

5

patient to receive a total of up to a 90-day supply of a Schedule II controlled substance provided the following conditions are met:

    i. Each separate prescription is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice,

    ii. The individual practitioner provides written instructions on each prescription (other than the first prescription, if the prescribing practitioner intends for that prescription to be filled immediately) indicating the earliest date on which a pharmacy may fill each prescription;

    iii. The individual practitioner concludes that providing the patient with multiple prescriptions in this manner does not create an undue risk of diversion or abuse;

    iv. The issuance of multiple prescriptions as described in this section is permissible under the applicable state laws; and

    v. The individual practitioner complies fully with all other applicable requirements as well as any additional requirements under state law."

    f.    21 U.S.C. § 841(a)(1) makes it a crime for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law. Distribution of a scheduled controlled substance in violation of 21 U.S.C. § 841(a)(1) (often referred to as "diversion") occurs when a medical doctor or practitioner

6

knowingly and intentionally prescribes a controlled substance, knowing the drugs were controlled, for a purpose other than a legitimate medical purpose and outside of "the usual course of professional practice." *See United States v. Moore*, 423 U.S. 122, 124 (1975) ("We . . . hold that registered physicians can be prosecuted under 21 U.S.C. § 841 when their activities fall outside the usual course of professional practice."); *see also United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006) ("[T]o convict a practitioner under § 841(a), the government must prove (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice.").

## OVERVIEW OF DRUG DIVERSION INVESTIGATIONS

9. Courts have generally recognized several factors evidencing that a physician's behavior was without a legitimate medical purpose and outside the usual course or scope of professional practice, examples of which include the following, *see, e.g., United States v. Rosen*, 582 F.2d 1032, 1035 (5th Cir. 1978):

      a.    The physician prescribed or dispensed an inordinately large quantity of controlled substances.

      b.    The doctor issued large numbers of prescriptions.

      c.    The patient received no or a very cursory physical examination.

      d.    The physician advised the patient to fill prescriptions at different pharmacies.

7

e. The doctor prescribed controlled substances at intervals inconsistent with legitimate medical treatment.

f. The physician used street slang rather than medical terminology for the drugs prescribed.

g. No logical relationship existed between the drugs prescribed and the treatment of the alleged condition.

h. The physician wrote more than one prescription in order to spread them out.

10. In addition, the medical expert consulted in this investigation, Dr. Timothy Munzing, M.D., set forth specific criteria to consider when determining if a physician acted within the scope of professional practice. According to Dr. Munzing, in a pain management practice, a physician must have:

a. adequately evaluated the patient and used good judgment in developing a treatment plan;

b. Physical exam - general plus detailed exam of painful area

c. practiced periodic clinical reviews;

d. obtained or contemplated specialty consultation;

e. kept and maintained complete and accurate medical records;

f. developed a working diagnosis and maintained a differential diagnosis;

g. offered alternative therapies and approaches to treating the disorder;

h. reviewed previous medical records, diagnostic work-up, and medical

8

therapy;

      i.     developed a plan of action for future diagnostic evaluation.

## THE CONTROLLED SUBSTANCES DISCUSSED IN THIS AFFIDAVIT

11.    Based on my training and experience, I know the following about the controlled substances discussed in this affidavit:

      a.     Oxycodone is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance. Oxycodone is also known by its brand name, OxyContin®. Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain. Oxycodone is sometimes referred to as "synthetic heroin." An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time. Oxycodone and OxyContin® are formulated in several strengths between 10mg and 80mg per tablet. Oxycodone can be habit forming and is a commonly abused controlled substance that is diverted from legitimate medical channels. Oxycodone typically has a street value of $1 to $2 dollars per milligram, or $30 to $60 per 30mg Oxycodone pill in Alaska.

      b.     Tramadol is a schedule IV narcotic, sold under the brand name Ultram among others, is an opioid pain medication used to treat moderate to moderately sever pain. Tramadol is most commonly prescribed in 50mg or 100mg tablets. Tramadol can be habit forming and is a commonly abused controlled substance that is diverted from legitimate medical channels. 100 mg Tramadol tablets have a street value in Alaska of $10 to $20 per tablet.

9

c.     Suboxone is a Schedule III narcotic that contains a combination of buprenorphine and naloxone. Buprenorphine is an opioid medication, sometimes called a narcotic. Naloxone blocks the effects of opioid medication, including pain relief or feeling of well-being that can lead to opioid abuse. Suboxone are formulated in sublingual films which dissolve under the tongue. Individual Suboxone films have a common street value in Alaska of $20 per film.

d.     Hydrocodone is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance. Hydrocodone is also found in medications known the brand names Vicodin®, Norco®, and Lortab®. Hydrocodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of mild to moderate pain. Accordingly, the prescription is generally for a modest number of pills to be taken over a short period of time. Hydrocodone is formulated in combinations of 5-10mg of hydrocodone and 325-750mg of acetaminophen. Hydrocodone can be habit forming and is a commonly abused controlled substance that is diverted from legitimate medical channels. Hydrocodone typically has a street value of $1 per milligram tablet in Alaska.

e.     Alprazolam is a generic name for a Schedule IV benzodiazepine prescription drug. Alprazolam is marketed under the brand name Xanax®. When used for a legitimate medical purpose, it is used to treat such conditions as anxiety, depression and panic disorder. Alprazolam comes in the following strengths: 0.25mg, 0.5mg, 1mg, and 2mg. Alprazolam is a commonly abused controlled substance that is diverted from legitimate medical channels. Alprazolam and Xanax® typically have a street value of

10

$10 per tablet in Alaska. Exceeding the recommended dose or taking this medication for longer than prescribed may be habit-forming.

        f.      Methadone is a Schedule II narcotic synthetic opioid. It is used legally to treat addiction to narcotics and to relieve severe pain, often in individuals who have cancer or terminal illnesses. Although methadone has been legally available in the United States since 1947, more recently it has emerged as a drug of abuse. Methadone use for addicts (rather than for pain) is only legal in the setting of a Methadone Clinic that is licensed for this purpose. Physicians legally may only prescribe Methadone for pain in other settings by law. Due to the potentially extreme dangers of Methadone (long half-life, liver excretion, etc.) when prescribing Methadone, it must be done with great care and intense monitoring. Patients must be informed specifically of the significant risks of overdose and death.

        g.      Fentanyl is a powerful synthetic opioid that is similar to morphine but is 50 to 100 times more potent. It is typically used to treat patients with severe pain, especially after surgery. It is also sometimes used to treat patients with chronic pain who are physically tolerant to other opioids. Synthetic opioids, including fentanyl, are now the most common drugs involved in drug overdose deaths in the United States. When prescribed by a physician, fentanyl is often prescribed in the form of a patch that is put on a person's skin. Fentanyl patches have a common street value of $1 dollar to $2 dollars a microgram, or to $200 for a single 100 Microgram patch.

## STATEMENT OF PROBABLE CAUSE

## "RED FLAGS" AS RELATED TO SPAYD

12.     A DEA Investigative Analyst noted several "red flags" common to diversion investigations that were present in SPAYD's prescribing practices. These "red flags" included: writing prescriptions early for individuals who are still within the timeframe of their last prescription; writing prescriptions that exceed Federal guidelines developed by the Center for Disease Control; writing prescriptions for potentially harmful combinations of narcotics and sedatives to the same individuals; numerous patients traveling hundreds of miles from Fairbanks, North Pole, Barrow, Prudhoe Bay, King Salmon, and other distant locations to obtain large opioid prescriptions, passing similar clinics on the way; and patients who alternate pharmacies, names, addresses and methods of payment for prescriptions, which is a tactic often used to avoid detection of prescription drug abuse. Another "red flag" specific to SPAYD is that her clinic, Eagle River Wellness, advertises itself as an addiction treatment clinic specializing in the use of Suboxone. Suboxone is SPAYD's 40th highest prescribed drug, surpassed by mostly other narcotics.

13.     Between January 2014 and June 2019, SPAYD prescribed over <u>four million</u> opioid narcotic pills to patients in Alaska, including to numerous patients who traveled hundreds of miles from Fairbanks, North Pole, Barrow, Prudhoe Bay, King Salmon and other distant locations to obtain their prescriptions.

14.     The top ten medications prescribed by SPAYD are as Oxycodone HCL 15mg, Methadone HCL 10mg, Oxycodone HCL 30mg, Oxycodone Acetaminophen 10-

325, Hydrocodone Acetaminophen 10-325, Alprazolam 1mg, Diazepam 10mg, Zolpidem Tartrate 10mg (sedative), Carisoprodol (muscle relaxer) 350mg and Hydromorphone 8mg.

15.    Numerous pharmacies in Alaska have stopped filling prescriptions written by SPAYD. Agents have identified at least one specific pharmacy in Fairbanks that refuses to fill SPAYD's prescriptions because of her prescribing practices, and in recorded conversations SPAYD admitted that CARRS and Walmart will not fill her prescriptions.

16.    The U.S. Department of Health and Human Services, Office of the Inspector General prepares profiles of Medicare service providers who pose a high risk of fraud and abuse. As of September 19, 2019, SPAYD ranked in the top 0.1% (184th) out of over 170,000 U.S. medical prescribers for the average number of days that SPAYD's patients have been prescribed opioids by SPAYD. SPAYD ranked in the top 0.4% (690th) out of 170,000 prescribers for actual-versus-expected volume of vulnerable-to-abuse opioid prescriptions issued, and SPAYD ranked in the top 0.5% (1,014th) out of 170,000 prescribers for daily morphine milligram equivalent doses of opioids.

**INFORMATION ON THE STANDARD OF CARE REGARDING NURSE PRACTICIONERS AND OPIOID PRESCRIBING**

17.    Sec. 08.68.705. Maximum dosage for opioid prescriptions. (a) An advanced practice registered nurse may not issue:

18.    (1) an initial prescription for an opioid that exceeds a seven-day supply to an adult patient for outpatient use;

19.    (2) a prescription for an opioid that exceeds a seven-day supply to a minor; at the time an advanced practice registered nurse writes a prescription for an opioid for a minor, the advanced practice registered nurse shall discuss with the parent or guardian of the minor why the prescription is necessary and the risks associated with opioid use.

20.    (b) Notwithstanding (a) of this section, an advanced practice registered nurse may issue a prescription for an opioid that exceeds a seven-day supply to an adult or minor patient if, in the professional judgment of the advanced practice registered nurse, more than a seven-day supply of an opioid is necessary for

21.    (1) the patient's acute medical condition, chronic pain management, pain associated with cancer, or pain experienced while the patient is in palliative care; the advanced practice registered nurse may write a prescription for an opioid for the quantity needed to treat the patient's medical condition, chronic pain, pain associated with cancer, or pain experienced while the patient is in palliative care; the advanced practice registered nurse shall document in the patient's medical record the condition triggering the prescription of an opioid in a quantity that exceeds a seven-day supply and indicate that a nonopioid alternative was not appropriate to address the medical condition; or

22.    (2) a patient who is unable to access a practitioner within the time necessary for a refill of the seven-day supply because of a logistical or travel barrier; the advanced practice registered nurse may write a prescription for an opioid for the quantity needed to treat the patient for the time that the patient is unable to access a practitioner; the advanced practice registered nurse shall document in the patient's medical record the reason for the prescription of an opioid in a quantity that exceeds a seven-day supply and

14

indicate that a nonopioid alternative was not appropriate to address the medical condition; in this paragraph, "practitioner" has the meaning given in AS 11.71.900.

23.    (c) This section does not authorize an advanced practice registered nurse to prescribe a controlled substance if the advanced practice registered nurse is not otherwise authorized to prescribe a controlled substance under policies, procedures, or regulations issued or adopted by the board.

## EXPLANATION OF OPIOID DOSAGE STRENGTHS AND MORPHINE MILLIGRAM EQUIVALENTS (MME)

24.    Morphine Milligram Equivalents (MME) is used by the Center for Disease Control (CDC) to determine the strength of different opioids when compared to each other. The following CDC guidelines have either been published as standards for prescribing and dispensing opioids, or have been published in studies detailing the effects of opioids.

*20 MME/day* – A standard daily amount of opioids. Reasonably safe. Equivalent to 20 mg of hydrocodone (4 tablets of 5mg hydrocodone (Vicodin)) per day.

*50 MME/day* – The safest high dosage of opioids. The risk of opioid related overdose death is double the risk when taking 20 MME. Equivalent to 50 mg of hydrocodone (10 tablets of 5mg hydrocodone (Vicodin)) per day.

*90 MME/day* – With reasonable and recorded justification in patient records, this level of opioid can be prescribed and filled, though the risk of opioid related overdose death increases. Equivalent to 90 mg of hydrocodone (18 tablets of 5mg hydrocodone (Vicodin)) per day.

**200 MME/day** – At this level of opioid intake, studies have found 1 in 32 (3%) of patients will statistically die of an opioid overdose. Equivalent to 200 mg of hydrocodone (40 tablets of 5mg hydrocodone (Vicodin)) per day.

25.     An independent consulting firm performed an analysis of SPAYD's prescribing history between 2014 and 2019. The analysis concluded that out of SPAYD's 506 total unique patients during that time period, 453 (89%) received opioid prescriptions and over 230 received opioid prescriptions over 200 MME per day. That analysis also concluded that at least nineteen (19) of SPAYD's 453 opioid patients (4%) died within approximately one month of filling an opioid prescription(s) issued by SPAYD. Twelve (12) patients died within two weeks of filling SPAYD's prescription(s), and five (5) of those died the same day or next day. An expert concluded that although the cause of death for some of these patients is currently unknown, many deceased patients obtained controlled substance medications from SPAYD within a very short timeframe before their death and that there is a distinct possibility that SPAYD's prescribing may be a contributing factor in the patients' deaths. Two specific instances of overdose deaths likely caused by SPAYD's prescribing will be discussed in Paragraphs 73-86 and 92-93.

## PATIENT AND PHARMACIST INTERVIEWS

26.     On November 16, 2018, Special Agent (SA) Michael Burke and Task Force Officer (TFO) Edward Mooney, met with CARRS Pharmacist Manager, Pharmacist 1, at the Drug Enforcement Administration (DEA) Anchorage District Office (ADO) for an interview. Pharmacist 1 was the Pharmacist Manager working at the Penland Parkway

16

CARRS Pharmacy on November 1, 2018, when Patient 1 dropped off a prescription issued by SPAYD, addressed to Patient 2. The prescription was issued for one hundred and eighty 10mg Percocet. The prescription was written in hard copy form by SPAYD.

27. On November 1, 2018, Pharmacist 1 said a male came into the pharmacy. The male, who was identified by Pharmacist 1 by his driver's license as Patient 1, claimed he was dropping off a prescription for his friend, Patient 2. Patient 1 said Patient 2 usually gets his prescription filled at other CARRS' Pharmacies. Patient 1 claimed this was the first time he had dropped a prescription off for Patient 2.

28. As a Pharmacist Manager, Pharmacist 1 said his steps for filling controlled substances include checking the Alaska Prescription Drug Monitoring Program (PDMP) website, checking the filling history of the patient and also checking how the patient has been paying, whether in cash or insurance. Prescription Drug Monitoring Program (PDMP) is a database that records distribution of prescribed controlled substances by identifying the prescriber, prescription number, prescription written and dispense dates, and patient information. PDMP is maintained by the State of Alaska's Division of Corporations, Business and Professional Licensing. Pharmacist 1 said he checked Patient 2's history and saw that he has had prescriptions filled at five different CARRS' Pharmacies. Pharmacist 1 said this raised a red flag. The prescription was Tri folded and Pharmacist 1 said it looked like it was folded so it could be mailed out. The prescription was an actual written prescription and was not a photocopy.

29. Pharmacist 1 said he tried running the prescription through Patient 2's insurance, but it was rejected. The insurance provider was Aetna. Pharmacist 1 told

Case 4:19-mj-00023-SAO   Document 1-1   Filed 10/08/19   Page 17 of 39

Patient 1 that insurance denied the prescription and it would cost $654.69 to get it filled. Pharmacist 1 believed Patient 1 would end up trying to get it filled somewhere else. Patient 1 said to hold off filling the prescription and that he was going to call his friend. Patient 1 got on his phone and when he was done, he told Pharmacist 1 he would be back in 2 hours. Patient 1 returned and paid for the prescription with $654.69 cash. Patient 1 also said he tried calling Patient 2, but Patient 2 was flying to Seattle. Pharmacist 1 said the prescription was filled and Patient 1 left the pharmacy.

30.     Based on the suspicion it raised, Pharmacist 1 called Patient 2. Pharmacist 1 located Patient 2's phone number off his pharmacy profile. Patient 2 did not answer and Pharmacist 1 left a message. Patient 2 called back and Pharmacist 1 verified who he was by his date of birth. Pharmacist 1 informed him that Patient 1 dropped off a prescription saying it was for Patient 2. Patient 2 said he does not see SPAYD as his doctor and he does not use oxycodone. Patient 2 said he had worked with Patient 1 at Department of Natural Resource but that was only a couple times a year.

31.     On November 2, 2018, Pharmacist 1 called SPAYD'S office and left a message for her. SPAYD called back on November 5, 2018 and spoke to a different pharmacist, Pharmacist 3 when Pharmacist 1 was on his day off. On November 29, 2018 at approximately 11:00 am, Special Agent (SA) Mike Burke and Task Force Officer (TFO) Edward Mooney met with Penland Parkway CARRS Pharmacist 3 regarding Jessica SPAYD and the prescription written for Patient 2. Pharmacist 3 spoke to SPAYD by phone on November 5, 2018.

32.     Pharmacist 3 told SPAYD that it appeared SPAYD had written the

18

prescription for a different patient. SPAYD told Pharmacist 3 she sees Patient 2 every month and that she conducts a urine analysis on him during his visit. SPAYD also gave Pharmacist 3 Patient 2's phone number.

33.    Pharmacist 3 said SPAYD tried to convince him that she was acting according to the rules of her profession. She told him about the process she does to test her patients and that the script for Patient 2 was not fraudulent.

34.    On November 7, 2018, Pharmacist 1 called SPAYD'S office again. SPAYD said Patient 2 was her patient. Pharmacist 1 informed SPAYD that he had already called Patient 2 who denied being a patient of hers. SPAYD said she was sorry and this would not happen again. She said she would not dispense for Patient 2 again. When Pharmacist 1 indicated to SPAYD that he was going to contact DEA over the matter, SPAYD asked Pharmacist 1 not to contact DEA. Pharmacist 1 said SPAYD tried to make him feel sorry for her. SPAYD said she would stop writing three-month supplies for prescriptions and she would be stricter with patients.

35.    SPAYD again asked Pharmacist 1 to not reach out to the police or DEA about the incident. She said she had a long history with CARRS Pharmacy and is a working parent with a daughter.

36.    Pharmacist 1 asked SPAYD if she had mailed the prescription to Patient 2 and SPAYD said yes. She said she had last seen Patient 2 three months ago. SPAYD said she knows Patient 1 and also knows that Patient 1 picks Patient 2's prescriptions up for him. Pharmacist 1 said he checked Patient 2's PDMP records which showed Patient 1 does pick up prescriptions written for Patient 2. Pharmacist 1 said all the signatures

match Patient 1 at all the CARRS he had picked up prescriptions.

37.     Pharmacist 1 said per the PDMP, Patient 1 also sees SPAYD and another doctor. Patient 1 gets Oxycodone and Fentanyl every month and fills the prescriptions at an independent pharmacy across from Eagle River CARRS.

38.     A records check of Alaska Public Sharing Information Network (APSIN) shows that, as of December 27, 2017, SPAYD and Patient 1 have shared the physical home address of SUBJECT PREMESIS-2: 5201 East Northern Lights Boulevard, Unit 2S, Anchorage, AK 99508. Agents conducted surveillance and confirmed that SPAYD and Patient 1 share that address, including by seeing Patient 1's vehicle park in front of the residence.

39.     Toll records reviewed by investigators between October 15, 2018 and May 31, 2019 show the following: SPAYD called Patient 1 1063 times; Patient 2 called Patient 1 22 times. Further, open-Source searches reveal that Patient 1 and Patient 2 share P.O. Box 671836 in Chugiak, AK, and also have a shared residential address at 770 M Street in Anchorage, AK.

40.     On March 21, 2019, a DEA Task Force Officer (TFO) received a call from Wasilla Fred Meyer Pharmacy Manager (PM) Pharmacist 2. Pharmacist 2 reported she had a recent contact with SPAYD by phone, regarding SPAYD'S patient, Patient 3. DEA TFOs met with Pharmacist 2 at Wasilla Fred Meyer Pharmacy on March 21, 2019.

41.     Pharmacist 2 said Patient 3 has been having his prescriptions filled at Wasilla Fred Meyer pharmacy since December 27, 2018. Patient 3 consistently receives prescriptions monthly for Oxycodone 10-25mg and Methadone 10mg from SPAYD. Per

20

Pharmacist 2, the pharmacy has told Patient 3 they would have to see a decrease in dose every month for his prescriptions until his dose is below 90 Morphine Milligram Equivalents (MME) and they are in the process of discontinuing methadone.

42. On January 24, 2019 and February 19, 2019, Patient 3's daughter called about having her father's prescriptions filled. The Pharmacy staff told Patient 3's daughter that it was too soon to have her father's prescriptions filled. The prescriptions were for the same dose as previously dropped off.

43. On February 21, 2019, pharmacy staff spoke with SPAYD about a plan to decrease the dosage of Patient 3's prescriptions. SPAYD said she would decrease the methadone by 1 mg a week.

44. On March 21, 2019, Patient 3's daughter dropped off prescriptions for Patient 3 for Oxycodone 10-325mg and Methadone 10mg. Pharmacist 2 called SPAYD because there was no decrease of mg as they had previously talked about. SPAYD told Pharmacist 2 "I was hoping he was going to go to another pharmacy." Pharmacist 2 told SPAYD that they were not comfortable filling these doses and SPAYD told Anderson "Well, just change them however you want to." Pharmacist 2 told SPAYD that she would not change the prescriptions and would give them back to the patient. Pharmacist 2 said she would have the patient go discuss the prescriptions with SPAYD or have him go to another pharmacy.

## UNDERCOVER APPOINMENTS WITH SPAYD

45.     A DEA Undercover Officer (UC) conducted four undercover appointments with SPAYD between May and July 2019.  The appointments occurred at SPAYD's clinic, Eagle River Wellness and were recorded on audio and video.  I have reviewed relevant portions of the audio and video from these appointments and observed the following.

46.     The first appointment was Thursday, May 9, 2019 at 1:30pm.  UC picked up an initial patient informational packet on April 26, 2019.  The front desk employee then brought UC back to check vitals.  UC then sat in the waiting room.  Approximately four minutes later, SPAYD introduced herself to UC and brought him into her office.  UC explained that he had been on Oxycodone for a long time and usually gets it from "friends."  UC explained that he has had prescriptions for Oxycodone in the past.  UC explained that he has been working part time in the North Slope and wanted a prescription for oxycodone for the "hitch."

## SPAYD EXPRESSES CONCERNS ABOUT BEING INVESTIGATED BY MEDICAL BOARD AND DEA

47.     SPAYD asked UC how much Oxycodone he takes and UC answered that the most he takes is four 30 mg tablets a day.  UC said he usually takes "the blues," which is common street slang meaning 30 mg Roxycodone.  SPAYD said that UC knows "what's going on in America" and that the pharmacists have just gone crazy (implying that the pharmacies have gone crazy because they refuse to fill her prescriptions).  She

22

said even if she wanted to, the pharmacists would never fill that much. UC said that he did not need that much but that if he could just get a smaller prescription of Oxycodone, he would be able to get it filled by a pharmacist friend in Fairbanks.

48.     SPAYD said that the pharmacist might call the nursing board on her which she said has happened recently. She said someone even complained to the board that she was impaired and said that the board has been really unprofessional. SPAYD said that the nursing board is "hanging their hat" on the fact that someone can overdose and that now they (nursing board) are trying to tell her how to run her practice after 18 years. SPAYD seemed to be slurring her words during this appointment with the UC.

49.     UC once again asked if he could get a smaller prescription for Oxycodone and SPAYD said that *she can't treat addiction with Oxycodone because it's a felony.* She said she can only help UC if he had been referred here and through diagnostics. She said she would need diagnostic paperwork and that if she got those things, she could see UC next week. UC said he would be leaving for the slope next week and she said "I'm sorry." She said that she's dealt with this with a few patients recently. She said these pharmacists are keeping track of everything and that there is no way around the system now. She said even if she mailed a prescription to a prescription mail service, they would find out. SPAYD told the UC that she could prescribe him Suboxone today.

## SPAYD AGAIN ACKNOWLEGES THAT PRESCRIBING OXYCODONE FOR OPIOID ADDICITON IS A FELONY

50.     SPAYD asked UC, "Well do you have a pain problem"? UC said that he has, but in the past. UC asked again if he could get a low dose of Oxycodone and

SPAYD said she can't, and SPAYD added "for all I know, you could be DEA, it's really come down to that." SPAYD explained that prescribing oxycodone for opiate addiction was a felony and she could go to prison for it. She said that if she had pharmacists calling the nursing board to tell them that she (SPAYD) was impaired at work, then she's not being paranoid. The UC said that he has had back issues before. SPAYD said we require a referral but she could be a little loose on that and that UC could get it to her later. After further discussions, SPAYD said the most she could do is maybe three 15's, maybe four (meaning 15 mg Oxycodone).

### UNDERCOVER INDICATES HE CAN GET SUSPICIOUS PRESCRIPTIONS FILLED BY A FRIEND WHO WORKS IN A PHARMACY IN FAIRBANKS AND SPAYD AGREES TO PRESCRIBE OXYCODONE TO UC

51.     SPAYD asked how UC would get the prescription filled and UC explained that he had a female friend who worked at a pharmacy in Fairbanks. SPAYD said that she'd then be comfortable writing UC a smaller Oxycodone prescription and that UC's pharmacy friend would probably be comfortable filling it. SPAYD said she doesn't think it would make her (SPAYD) look terrible. She said that she thinks there still could be a chance of overdose with that much Oxycodone and then asked about UC's withdrawal symptoms. She asked if UC could come back in two weeks and UC said it would be three weeks because he will be on the slope for two weeks.

### SPAYD APPEARS MUCH MORE WILLING TO WRITE OXYCODONE PRESCRIPTION AFTER DISCOVERING UC WILL PAY CASH

52.     UC mentioned that he was hoping to have insurance after this next hitch and SPAYD asked if he was paying cash. UC answered yes and SPAYD said that she

will only charge UC $300.00 for this visit as long as he brings a referral next visit. She said then she will charge UC $120.00 on the next visit. She said again to get a referral because she knew of one doctor that lost his license. She then added that that doctor had written a huge amount of Oxycodone that led to an overdose and that it happened three times. She said she would write on his prescription that it was a titration.

## SPAYD INQUIRES ABOUT UC'S BACK PAIN *AFTER* AGREEING TO WRITE OPIOID PRESCRIPTION

53.     After already agreeing to write a prescription for Oxycodone, SPAYD then told UC to tell her about his back pain. SPAYD was typing as her and the UC discussed this topic. In my training and experience, doctors will type patients' symptoms into electronic medical records. She asked if they offered him any treatments when he was in Missouri and he answered "not really." She asked how he came to use Oxycodone and he said "partying." She again said Suboxone will be good for UC and explained why again. She asked if he had any other substance abuse issues and UC answered no. She asked if UC had any criminal issues and he said he had been to jail for a bar fight. She asked if he had been arrested for substance abuse and he said no.

54.     SPAYD asked how quickly UC goes into withdrawals after stopping opioids and he said quickly. SPAYD then said "you said that you that you have a friend?" referring to the friend UC claimed he had working in a pharmacy. SPAYD then said she could also write UC a prescription for Tramadol which wouldn't provide a euphoric feeling but would help keep UC from going into withdrawals. SPAYD asked UC if he ever had a seizure and he said no. SPAYD said "they" were totally trying to

Case 4:19-mj-00023-SAO   Document 1-1   Filed 10/08/19   Page 25 of 39

blame pain management for all the problems but that it's not "our fault." She explained that Trump had really put the hammer down on Opioids and "us." SPAYD finished writing the prescriptions and explained that Carr's and Wal-Mart pharmacies won't fill her prescriptions.

55.     SPAYD then asked about how UC had gotten a previous appointment with a different doctor in Alaska. UC answered that he had just called and gotten an appointment. She asked "you didn't need a referral"? UC said no. She then explained that that doctor was always in and out of trouble. She led UC out to pay for the appointment which was $300.00 cash, paid in Official Advanced Funds (OAF). The front desk employee explained that UC would have to provide a urine sample in order to get his prescriptions so the UC provided the sample. SPAYD then asked UC to fill out another set of paperwork regarding pain management which he did.

56.     SPAYD never conducted any sort of physical exam on the UC during that, or any other visit.

57.     The UC departed the premises with two prescriptions written by SPAYD to UC: (1) Oxycodone 5 mg - #27; (2) Tramadol 50 mg - #24.

## UC APPOINMENT WITH SPAYD ON MAY 15, 2019

58.     The same DEA Undercover Officer (UC) made an appointment with SPAYD at Eagle River Wellness. The appointment was set for Thursday, May 15, 2019 at 4:00pm. UC entered the office at approximately 4:00pm and checked in. The front desk employee then brought UC back to check vitals. UC then sat in the waiting room. At approximately 4:26 pm, SPAYD called UC back to her office.

26

59.     SPAYD told UC told she brought his file home and looked at it over the weekend.

## UC ACKNOWLEDGES TO SPAYD THAT HE
## FINISHED HIS PRESCRIPTION EARLY

60.     UC explained that he thought he had finished his last prescription (for oxycodone) early.  UC then clarified that he had finished the oxycodone prescription early but not the Tramadol.  SPYAD explained that she had to give UC that "stupid dose because of the pharmacies."  SPAYD asked if UC wanted to go on Suboxone this time.  UC explained that he was going to the North Slope for work for two weeks.  SPAYD said "[s]o you want me to give you enough Oxycodone to get you through that."  UC answered in the affirmative.  SPAYD explained that she eventually wanted to put UC on Suboxone.

61.     SPAYD explained that she wanted to give UC one Suboxone so he could try it but she's not supposed to prescribe both Oxycodone and Suboxone. SPAYD asked UC where he got his last prescription filled and he said Fairbanks.  She said that things are different in Fairbanks and they're not under as much pressure as pharmacies and providers in Anchorage.  She explained that Trump had put a lot of pressure on the industry so things are changing.

## SPAYD WRITES UC A LARGER PRESCRIPTION FOR OXYCODONE AND
## AGAIN NEGLECTS TO PERFORM ANY PHYSICAL EXAM

62.     SPAYD agreed to raise UC's dosage to forty five 15mg (oxycodone) this time (in reality she ended up raising it even further, to 63).  She asked how long UC would be gone and then appeared to do some calculations.  SPAYD said she would give

27

UC enough for twenty one days. They spoke about SPAYD's dog for a while and then SPAYD led UC out to the front desk. UC received his prescription. UC paid $120.00 cash in Official Advanced Funds (OAF) for the visit.

63.     UC departed the appointment with a prescription for Oxycodone 15mg - #63 written by SPAYD to UC.

## UC APPOINMENT WITH SPAYD ON JUNE 13, 2019

64.     The same DEA Undercover Officer (UC) made an appointment with SPAYD for June 13, 2019 at 3:00 pm at Eagle River Wellness in Eagle River, Alaska.

## SPAYD IS NOT PRESENT FOR APPOINMENT BUT PRESCRIPTION FOR OXYCODONE IS ALREADY FILLED OUT FOR UC

65.     UC entered Eagle River Wellness at approximately 2:56 pm and made contact with the front desk employee. She informed UC that she had a prescription for UC and that SPAYD wasn't in today. The employee went into a back room and retrieved a prescription. She informed UC that he would be required to provide a urine specimen.

66.     The employee then said there was a $25.00 prescription pick up fee. UC informed the employee that UC had $1.00 bills and $100.00 bills. She advised that she could not break a $100.00 bill and agreed to waive the fee until next appointment. UC and employee agreed on the next appointment time for July 2, 2019 at 1:30pm. The employee handed UC the prescription for sixty three 15mg Oxycodone pills. UC then departed the office.

## UC APPOINMENT WITH SPAYD ON JULY 2, 2019

67.     The same Drug Enforcement Administration (DEA) Undercover Officer

(UC) made an appointment with SPAYD for July 2, 2019 at 2:30pm pm at Eagle River Wellness in Eagle River, Alaska.

68.     UC entered the office and checked in with the front desk staff. At approximately 2:45 pm, a staff member told UC he was due for a urinalysis. UC provided a medical insurance card to the staff member and then entered the bathroom to give a urinalysis.

69.     At approximately 2:50 pm, SPAYD called UC back to her office. SPAYD asked UC if he was ready to go on Suboxone. UC said that he wanted to "maintain the status quo" meaning he wanted to continue getting Oxycodone.

### SPAYD TELLS UC SHE CAN NO LONGER PRESCRIBE OXYCODONE TO HIM FOR OPIOID TREATMENT AND THAT THE PREVIOUS THREE PRESCRIPTIONS WRITTEN WERE ILLEGAL

70.     UC asked if we could do "just one more round" meaning Oxycodone. SPAYD replied: "I don't have any records to, like, justify giving you opiates. It's a problem. You have to present with pain, I can't prescribe off label for addiction, it's a felony. I'll go to jail." The UC asked "can we do just one more round [of oxycodone]" and she replies "no way, I should have never done it to begin with. And they are getting so strict on it. If you [inaudible] opiates off label … that's one of the areas where the DEA can get ya easily."

71.     SPAYD explained that DEA had recently come to another clinic where she also works and were asking all kinds of questions about her. She said that her boss told her they were asking a lot of questions and that she can't prescribe opioids off label.

72.     UC departed the appointment with a prescription for Suboxone 8/2 mg - #7

29

written by SPAYD to UC.

## INFORMATION REGARDING PATIENT OVERDOSE DEATHS

### DECEASED PATIENT 1

73. On February 7, 2016, a patient of SPAYD named Deceased Patient 1 died of an overdose from high quantities of prescription medication. Prior to Deceased Patient 1's death, SPAYD prescribed to Deceased Patient 1 the following:

74. January 11, 2016: 127 tablets of Methadone HCL 10mg, 180 tablets of Oxycodone HCL 15mg, 45 tablets Diazepam 10mg.

75. January 25, 2016: 180 tablets of Oxycodone HCL 15mg, 10 tablets of Diazepam 10mg, and 127 tablets of Methadone HCL 10mg tablets.

76. The total Morphine Milligram Equivalents (MME) per day that SPAYD prescribed to Deceased Patient 1 prior to her overdose death was approximately 1,350 MME, which is over ***six times*** the 200 MME threshold at which 1 in 32 patients is likely to die of an overdose.

77. On September 24, 2019, at approximately 2:00 pm, Drug Enforcement Administration (DEA) Task Force Officers (TFO) met with Deceased Patient 1's former boyfriend at his residence.

78. He and Deceased Patient 1 lived together for thirty years and were living together when Deceased Patient 1 died. He was the one who discovered Deceased Patient 1 had died.

79. Deceased Patient 1's former boyfriend stated that he drove Deceased Patient 1 to all of her appointments with SPYAD. He stated that after a while he would

simply wait in the parking lot for Deceased Patient 1 to finish her appointment, but initially would go in with Deceased Patient 1 to her appointments. He stated that at one appointment, he said in front of Deceased Patient 1 and SPAYD that he was concerned about how much medication Deceased Patient 1 was being prescribed. He said that Deceased Patient 1 became very angry with him so he never commented about it again.

80.    Deceased Patient 1's former boyfriend stated that he never saw Deceased Patient 1 receive a physical exam from SPAYD and that all of the appointments that he attended were conducted in SPAYD's office across a desk from each other. He stated that he doesn't recall Deceased Patient 1 and SPAYD discussing medical issues. He said that Deceased Patient 1 and SPAYD seemed to bond and spoke about troubles with ex boyfriends, ex husbands and children. He stated he never saw SPAYD require Deceased Patient 1 to give a urinalysis.

81.    Deceased Patient 1's former boyfriend stated that Deceased Patient 1 doctor shopped and convinced doctors to give her the medication she wanted until she was cut off. He stated that Deceased Patient 1 got cut off several times by other doctors and that SPAYD was her last doctor. SPAYD prescribed narcotics to Deceased Patient 1 from January 2014 until January 2016. SPAYD never cut Deceased Patient 1 off prior to her death.

82.    In short, on or about January 25, 2016, Deceased Patient 1 received prescriptions from SPAYD for oxycodone, methadone, and diazepam. On or about January 25 and 26, 2016, Deceased Patient 1 filled the controlled substance prescriptions she received from SPAYD at a pharmacy. On February 7, 2016, the oxycodone,

31

methadone, and diazepam prescribed by SPAYD resulted in the overdose death of Deceased Patient 1, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

## DECEASED PATIENT 2

83.     On December 22, 2015, a patient of SPAYD's named Deceased Patient 2 died of an overdose from high quantities of prescription medication.  Prior to Deceased Patient 2's death, SPAYD prescribed to Deceased Patient 2 the following:

84.     December 3, 2015: 300 tablets of methadone HCL 10mg (two prescriptions for 15 day supplies), and 180 tablets of hydromorphone 4mg (two prescriptions for a 30 and 15 day supply, respectively).

85.     The total Morphine Milligram Equivalents (MME) per day that SPAYD prescribed to Deceased Patient 2 prior to her overdose death was approximately 1,296 MME, which is over *six times* the 200 MME threshold at which 1 in 32 patients is likely to die of an overdose.

86.     In short, on or about December 3, 2015, Deceased Patient 2 received prescriptions from SPAYD for methadone and hydromorphone.  On or about December 17, 2015, Deceased Patient 2 filled the controlled substance prescriptions she received from SPAYD at a pharmacy.  On December 22, 2015, the methadone and hydromorphone prescribed by SPAYD resulted in the overdose death of Deceased Patient 2 in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

## MEDICAL EXPERT REVIEW

87.     Dr. Timothy A. Munzing, MD, is a licensed physician at Kaiser Permanente in California.  He has 33 years of experience as a physician leader

responsible for reviewing the quality of care provided to patients and nearly 30 years as a Family Medicine Residency Program Director teaching medicine to thousands of residents and medical students. Dr. Munzing is a full Clinical Professor at the University of California Irvine School of Medicine and a Professor at the developing Kaiser Permanente School of Medicine. For nearly a decade Dr. Munzing has been a Medical Expert Reviewer for the Medical Board of California (now California Department of Consumer Affairs, Division of Investigation, and Health Quality Investigation Unit (HQIU)). During this time, he has formally reviewed and provided opinions on over 120 cases, with over 80% at least partially dealing with issues pertaining to the legitimate and appropriate prescribing of opioid and other controlled medications to patients. Since 2014, Dr. Munzing has been a Medical Expert Reviewer for the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and other law enforcement agencies. He has been a medical expert in over 60 cases, most of which pertain to overprescribing of opioids and controlled substances. He has testified on at least 25 occasions in civil and criminal matters regarding the appropriate and legitimate prescribing of controlled medications to patients, as well as appropriate pain management strategies.

88.     The DEA hired Dr. Munzing to review SPAYD's prescribing history for the period of 2014 to 2019, as well as the four audio/videos of the undercover buys. After finishing his review, on September 24, 2019, Dr. Munzing wrote a report setting forth his expert opinion on SPAYD's prescribing activities and interactions with undercover officers/agents posing as patients.

**DR. MUNZING CONCLUDED THAT SPAYD'S PRESCRIBING TO THE UC AGENT INCLUDED "MULTIPLE EXTREME DEPARTURES FROM THE STANDARD OF CARE" AND THAT "[T]HE CONTROLLED SUBSTANCE PRESCRIBING [WAS] WITHOUT A LEGITIMATE MEDICAL PURPOSE AND [WAS] NOT IN THE USUAL COURSE OF PROFESSIONAL PRACTICE."**

89. In his expert report, Dr. Munzing discusses, in detail, the numerous inappropriate/illegal actions of SPAYD, some of which are detailed below:

    a. Dr. Munzing noted that the medical "history obtained was minimal and failed to explore necessary specifics of the area of pain. Vague answers were not explored. In fact, at the visits the patient said he has no pain."

    b. "Spayd says she cannot prescribe opioids, then rationalizes and agrees to do it 'onetime.' This became three times and at the last visit stated, 'I should never have done it.'" He noted that SPAYD "admitted knowing that prescribing opioids without pain" is "'a felony' and 'I could go to jail.'"

    c. "The patient admits that he is using the Oxycodone due to opioid abuse, rather than for any current pain. Spayd repeatedly encourages the use of Suboxone for opioid abuse disorder, but allows the UC to talk her into short course Oxycodone prescriptions."

    d. "At the 7/2/2019 visit – UC admits to obtaining Suboxone without a prescription. At the first visit, UC #1 also admitted that he received Oxycodone from "people", not via a prescription."

    e. "No exam performed at all – at any visit"

    f. "No medical records are available for review. On the video it

34

appears that medical records exist, but the content of which are unknown."

g. "The evaluation and monitoring of this patient was insufficient to medically justify prescribing and refilling controlled medications - no current pain issues and no specific details about addiction."

90. Dr. Munzing concluded this section of his report by explaining that "[t]he care provided [to the UC agent] is dangerous. APN Spayd's actions are alarming with the multitude of specifics outlined above. Patient care and prescribing laws, regulations, and standards were violated multiple times in many ways in the treatment of this patient. Spayd comments that pharmacies are cracking down and she cannot prescribe opioids without a referral, and then does just that. She also said prescribing to UC #1 was illegal and a felony, then did just that. [She says] 'I could go to jail', but Spayd still prescribes the oxycodone. The prescribing by APN Spayd of controlled substance medications, opioids and Suboxone specifically, is clearly outside the referenced guidelines, Standard of Care, and Federal laws, as detailed above. In my opinion, the care provided to this patient by APN Spayd, and the controlled substance prescribing includes multiple extreme departures from the standard of care. The controlled substance prescribing is without a legitimate medical purpose and is not in the usual course of professional practice."

## DR. MUNZING'S ANALYSIS OF SPAYD'S PRESCRIBING HISTORY

91. Dr. Munzing also performed a medical expert review of SPAYD's prescribing reports. The following are some of the findings from Dr. Munzing's expert report:

35

a.      The PDMP database of controlled substance prescriptions written by SPAYD for patients between January 2014 and July 2019 was reviewed.  During this timeframe, over 33,000 narcotic opioid prescriptions and over 4 million dosage units were written to approximately 453 unique patients.  Approximately 79% of the prescriptions written by SPAYD were for narcotic opioids, which is **very high**.  52% of the opioid prescriptions were for Oxycodone in one of multiple formulations. This medication is highly abused and diverted.  85% of the Diazepam prescribed were of the 10 mg dosing, the highest amount – red flag for drug abuse – diversion.  Many patients are prescribed combinations of CS medications, including multiple concurrent opioids, benzodiazepines, sedatives, carisoprodol (Soma), etc. Various combinations were found. Many hundreds of patients with very high opioid dosing - Morphine Milligram Equivalent over the CDC recommended limit of 90 mg/day.



b.     Twenty-five patients were selected for a more detailed review, based on potential significant areas of concern as far as the prescribing patterns identified. After the twenty-five patients were selected, they were further analyzed for the specific patient demographics, and the detailed prescribing specifics by patient and specific drug.

c.     According to the expert report, many patients have received controlled substance prescriptions from SPAYD with potentially serious issues of concern. Though it is not possible to give a final conclusive opinion as to whether these medications were prescribed for a medically legitimate purpose in the usual course of professional practice (Title 21) based solely on the PDMP data, based on the findings, and Dr. Munzing's extensive experience reviewing such cases, he found to a very high level of probability that after review of the medical records, once obtained if they exist, SPAYD failed to meet these requirements in prescribing these dangerous medications.

## DR. MUNZING'S ANALYSIS OF OVERDOSE DEATH

92.     Based only on the PDMP and the Autopsy information for Deceased Patient 1, it is Dr. Munzing's opinion that "the controlled substance medications prescribed by ANP Spayd to this decedent at a MME level of 1,350 mg/day plus Diazepam 10 mg three per day prior to her death were a significant contributing factor in the patient's death. Medical records, if available, would be helpful, however, at the opioid dosing level of 1,350 mg/day, overdose death is not a surprise. The Diazepam additionally increased the risk. Based on the review, the opioid in extremely high dosing and benzodiazepine medications were not medically justified and not usual professional practice."

37

93.     Based only on the PDMP and the Autopsy information for Deceased

Patient 2, it is Dr. Munzing's opinion that "the controlled substance medications

prescribed by ANP Spayd to this decedent at a MME level of 1,296 mg/day prior to her

death were a significant contributing factor in the patient's death. Medical records, if

available, would be helpful, however, at the opioid dosing level of 1,296 mg/day,

overdose death is not a surprise.  Based on the review, the opioid in extremely high

dosing medications were not medically justified and not usual professional practice."

94.     Recent investigation, including surveillance by DEA, indicates that SPAYD

and Patient 1 currently reside together at 5201 E. Northern Lights Boulevard, Unit 2S,

Anchorage, Alaska, 99508 and have resided together since December 27, 2017.  This

address has been verified through Alaska Public Safety Information Network.  SPAYD

prescribed controlled substances to Patient 1 monthly during the time she resided with

him, including Armodafinil and (less frequently) Alprazolam, both schedule IV

controlled substances.  Patient 1 also filled Patient 2's Oxycodone prescriptions written

by SPAYD on numerous occasions while Patient 1 was residing with SPAYD.  Dr.

Munzing commented on this situation in his expert report and noted the following: "Per

AMA Ethics – Unless in the case of an emergency, physicians shall not prescribe

Controlled Medications for themselves or for immediate family members.  In addition,

prescribing Controlled Medications to an individual in whom one is in a sexual, or

potentially sexual, relationship is NOT usual professional practice. This is common

knowledge in the medical profession."

95.     During a UC appointment on May 15, 2019, SPAYD informed the UC that

she had brought the UC's medical records home to review them. This indicates that SPAYD keeps hard copy or electronic medical records accessible in her office and is in the practice of bringing medical records to her residence at 5201 E. Northern Lights Boulevard, Unit 2S in Anchorage, Alaska.

## CONCLUSION

For all the reasons described above, I respectfully submit that there is probable cause to believe that SPAYD has committed violations of Title 21, United States Code, Section 841(a)(1), (b)(1)(C): Distribution of a Controlled Substance – Oxycodone, methadone and other Scheduled narcotic controlled substances; resulting in death.

Respectfully submitted,

Charles E. Flockhart
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this __8TH__ day of October at Fairbanks, Alaska,

SCOTT A. ORAVEC
United States Magistrate Judge

39